## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

PEOPLE'S ELECTRIC COOPERATIVE,  )
an Oklahoma rural electric cooperative  )
corporation  )
 )
             Plaintiff,  )
vs.  )      NO. CIV-12-1314-HE
 )
WESTERN FARMERS ELECTRIC  )
COOPERATIVE, an Oklahoma rural  )
electric cooperative corporation,  )
 )
             Defendant.  )

## ORDER

Plaintiff People's Electric Cooperative ("PEC") filed this action against defendant

Western Farmers Electric Cooperative ("WFEC"), alleging claims for breach of contract and

breach of the covenant of good faith and fair dealing. Plaintiff contends it is a third party

beneficiary of a series of contracts between Southwest Power Administration ("SWPA")[1] and

WFEC. It seeks to enforce WFEC's alleged promise to consent to SWPA's transfer of

certain hydroelectric power to PEC that is currently allocated to WFEC. Both parties have

moved for summary judgment, which is appropriate only "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed.R.Civ.P. 56(a). The court has viewed the evidence and any reasonable

inferences that might be drawn from it in the light most favorable to PEC, the party against

---

[1]*The agency is referred to in some documents as "SPA."*

whom it concludes summary judgment should be granted [2]

<u>Background</u>

The background facts are substantially undisputed. WFEC is a nonprofit rural electric cooperative which is governed by, and supplies wholesale power to, its members. It has twenty-two distribution cooperative members, plus Altus Air Force Base. The cooperative members then supply retail power to their customers. PEC is a rural electric distribution cooperative and a former member of WFEC.

Beginning in 1951, pursuant to an Electric Service Agreement, PEC purchased all of its wholesale electric power from SWPA, an agency of the Department of Energy that markets hydropower generated by the Army Corps of Engineers. SWPA's sales of federal hydropower is authorized by section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s. The Act requires the Secretary of Energy to transmit and dispose of power under his or her control "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." 16 U.S.C. § 825s. The Act also directs that "[p]reference in the sale of such power and energy shall be given to public bodies and cooperatives," often referred to as preference customers. Id.

PEC and SWPA amended their agreement numerous times, extending its term to 1977. The agreement was an "all requirements" contract, which obligated SWPA to provide PEC

---

[2]*Page references for briefs and exhibits are to the CM/ECF document and page number. For example, deposition page 24 of the deposition of Gary Roulet, which is Exhibit 2 to defendant's response brief, is referred to as Doc. #77-2, p. 1.*

with all its wholesale power needs.  SWPA also satisfied some or all of the wholesale electric power requirements of six other Eastern Oklahoma electric distribution cooperatives ("Eastern Cooperatives").[3]  Over time, the power needs of PEC and other cooperatives that had all requirements contracts with SWPA increased, but the agency's hydropower generation capability could not keep up.  In the late 1960's SWPA informed the cooperatives that it would no longer sell them all the hydropower they required after their current contracts expired in 1977.  The Eastern Cooperatives began to look for alternative long-term power sources and, in 1973, they entered into substantially identical Wholesale Power Agreements ("WPA") with WFEC.[4]  The WPA is silent regarding any right of PEC to regain its federal hydropower allocation from SWPA once the WPA terminated.

WFEC agreed to provide PEC and the other cooperatives with all the electric power they needed during the terms of their contracts.  The term of the PEC contract extended to July 1, 2011.  In return, the member cooperatives agreed not to extend any contracts they had with current suppliers beyond their existing terms and thereafter to purchase power solely from WFEC.  However, as noted in the WPA, WFEC did not have the capacity to supply all PEC's power requirements at the time the WPA was executed.[5]  Until December 1977, when

---

[3]The parties have referred to the Eastern Oklahoma distribution cooperatives by different names including Eastern cooperatives, the Sooner Group or Sooner Group cooperatives.  The court will refer to them as the Eastern Cooperatives.

[4]When they executed their Wholesale Power Agreements, each of the Eastern Cooperatives became a member of WFEC.  Each member of WFEC has a representative on the WFEC Board.

[5]Although the other cooperatives had similar agreements with WFEC, the court will discuss and refer only to WFEC's agreement with PEC.

its contract with SWPA expired, PEC continued to receive power directly from SWPA.  It would pay SWPA and then pay WFEC the difference between what it paid SWPA and what it would have paid WFEC if the latter had provided the power.  This insured that PEC (and the other Eastern Cooperatives) were paying the same rate for their electric power as all other members of WFEC.  *See* People's Elec. Coop. v. Western Farmers Elec. Coop., No. CIV-09-1129-HE (W.D.Okla. Oct. 14, 2009) (Second Amended Complaint, Doc. #55, ¶¶14-17).

When the Eastern Cooperatives joined WFEC, it already was a customer of SWPA with its own allocation of 100 MW of hydropower. WFEC became interested in a new contract with SWPA and, in March 1974, Robert E. Good, WFEC's general manager, wrote SWPA's administrator and requested a joint meeting "to explore possibilities of continuing power supply for the Eastern Cooperatives and some deficits that will accrue on [WFEC's] system." Doc. #72-8.

A resolution for adoption by each of the Eastern Cooperatives authorizing WFEC to represent them in negotiations with SWPA was drafted by WFEC's attorney, discussed with counsel for SWPA and presented to the WFEC Board.  It was distributed to the representatives of the Eastern Cooperatives at the WFEC Board Meeting.   The resolution WFEC approved stated:

> WHEREAS, the Cooperative has become a member of Western Farmers Electric Cooperative . . . and has authorized Western Farmers Electric Cooperative to represent this Cooperative in all negotiations with Southwestern Power Administration and all other suppliers; and
>
> WHEREAS, this Cooperative does not intend to enter into direct negotiations with Southwestern Power Administration and other electric suppliers but

relinquishes its rights to negotiate with such suppliers to the said Western Farmers Electric Cooperative

NOW, THEREFORE, BE IT RESOLVED, that this Cooperative relinquishes and transfers to Western Farmers Electric Cooperative any and all rights which it may have to negotiate with Southwestern Power Administration for extension of its present contract which expires July 1, 1977, or for a new contract; and that this Cooperative further relinquishes to Western Farmers Electric Cooperative on its behalf its preference rights under the Flood Control Act of 1944, as amended, and authorizes Western Farmers Electric Cooperative to conduct all negotiations with Southwestern Power Administration for this Cooperative and on its behalf for purchase of hydro electric power which may be now or hereafter allocated to preference customers; and that a copy of this resolution be forwarded to Southwestern Power Administration.

Doc. #72-10. PEC passed the resolution with no significant changes, as did the other Eastern Cooperatives.

A question arose as to whether the resolutions could be adopted without a vote of the Eastern Cooperatives due to a state statute, which required two-thirds of a cooperative's members to agree before the cooperative could transfer a substantial portion of its property. WFEC's attorney, Leslie Pain, stated in an opinion letter:

With reference to the alleged transfer of preference rights to take electric power from the United States Hydroelectric Project, I cannot see that any such transfer has taken place. There is nothing in the Federal statute granting the preference right holder any authority to transfer such rights. Moreover, Western Farmers Electric Cooperative has the same preference right, as an electric cooperative. The distribution cooperatives have, and they have full authority to do, contracted with Western Farmers Electric Cooperative to supply their total electric power requirements. They have authorized Western Farmers Electric Cooperative to contract with the Southwestern Power Administration on their behalf. With this authority, and with Western Farmers' duty to supply the power requirements of its member cooperatives, Western Farmers Electric Cooperative has full authority under the statute to contract for the power requirements of its members with Southwestern Power Administration under its own preference right based on these power requirements.

> Since the preference rights involved are matters of contract and statutory rights, there has been no transfer of property which would be subject to the requirement of approval by two-thirds of the membership of the distribution cooperative.

Doc. #72-20, pp. 2-3.[6]

SWPA provided WFEC with an initial draft of the 1977 contract that specifically referred to the Eastern Cooperatives and their individual prior allocations of hydropower. WFEC requested that the contract refer instead to a bulk amount of 260 MW of power. The language WFEC objected to was removed from subsequent drafts and did not appear in the 1977 Power Sales Contract.

Because its contract with SWPA had not been finalized and PEC's contract with SWPA was to expire on June 30, 1977, WFEC asked SWPA to continue providing electric service to PEC and the other Eastern Cooperatives under their individual contracts. WFEC and each of the cooperatives submitted identical letters to SWPA, asking for the continuation of service. The letters stated that the cooperatives had "duly authorized and designated Western Farmers Electric Cooperative to act for them and each of them and on their behalf with reference to supply of wholesale electric service." Doc. #72-26.

After a discussion during its August 12, 1977 meeting, the WFEC Board passed a resolution authorizing its president and secretary to execute an agreement with SWPA "under which [SWPA would] sell 260,000 KW of peaking power and 1,200 hours of peaking energy

---

[6]*All the letter in effect states is that because hydropower "preference rights" are created by contract and statute and are not typical "property" rights, the membership of the cooperative does not have to approve their transfer.*

annually for a term beginning October 1, 1977, and extending to May 31, 1997." Doc. #72-27, p. 7. The minutes reflect that during the meeting the SWPA called to inform the Board "that it was their understanding that on or before the effective date of the SPA contract, Western would have the ability to deliver the power requirements to its Eastern members," and that such language, if agreed to by the Board, should be incorporated into the contract. *Id.* at p. 8. With Board approval, the WFEC-SWPA agreement included language to the effect that WFEC would submit copies of contracts or agreements to SWPA "which demonstrate and evidence to the satisfaction of SWPA that Western can and will cause power and energy to be delivered to the 'Eastern Member Cooperatives' in quantities sufficient to fulfill their present and future electric service requirements." Doc. #72-30, p. 42 (Article XI, Section 3(b)(1)).

The Power Sales Contract ultimately entered into between WFEC and SWPA, dated November 14, 1977, contained the following language:

> **[I]n establishing the total quantity of peaking power and energy to be purchased by Western from SWPA, the parties hereto have included the quantities of such power and energy which SWPA would otherwise make available for purchase by seven [WFEC] member cooperatives in Oklahoma which previously purchased firm power service from SWPA under contracts which expired on June 30, 1977**, and to which, by contract with each such member cooperative, Western is obligated to furnish and delivery, or cause to be furnished and delivered, the power and energy required to fulfill their system load requirements;

> . . . .

> <u>Contingencies Related to Electric Service to Western's Eastern Oklahoma Cooperatives.</u> (a) It is recognized that because of the geographic location of its transmission facilities Western is unable, as of the date of the execution of this

Contract, to deliver power and energy to its seven member cooperatives located in eastern Oklahoma (hereinafter referred to severally and collectively as the 'Eastern Member Cooperatives'), to wit:

> Canadian Valley Electric Cooperative, Inc.,
> Choctaw Electric Cooperative, Inc.,
> East Central Electric Cooperative, Inc.,
> Kay Electric Cooperative,
> Kiamichi Electric Cooperative, Inc.,
> People's Electric Cooperative, and
> Southeastern Electric Cooperative.

It is further recognized that the "Eastern Member Cooperatives" are and have been purchasing firm power service from SWPA which was and is delivered, for the account of SWPA, from the systems of Oklahoma Gas and Electric Company and Public Service Company of Oklahoma (hereinafter "Oklahoma Companies") under contracts the effective terms of which expired on June 30, 1977, and that such firm power service has been continued at the request of the "Eastern Member Cooperatives" on a month-to-month basis, but to a date not later than November 30, 1977. It is also recognized that in allocating the quantity of "Hydro Peaking Power" and associated energy to be purchased by Western under Article II, hereof, SWPA included quantities of power and energy which SWPA had allocated and would otherwise make available for purchase by the "Eastern Member Cooperatives."

(b) Because of the circumstances summarized in Subsection (a), above, SWPA and Western understand and agree that this Contract shall not become effective unless on or before December 1, 1977:

> (1) Western submits to SWPA a copy of duly executed contracts . . . which demonstrate and evidence to the satisfaction of SWPA that Western can and will cause power and energy to be delivered to the "Eastern Member Cooperatives" in quantities sufficient to fulfill their present and future electric service requirements;

> (2) Western and the "Eastern Member Cooperatives" by written notice to SWPA, supported by appropriate resolutions adopted by their respective Boards of Trustees:

> (i) rescind and cancel the notices dates July 8. 1977, heretofore submitted to SWPA, copies of which are attached hereto marked

8

Exhibit "6", and by this reference made a part hereof; and

(ii) request that SWPA discontinue as of midnight, November 30, 1977, any and all sale and delivery of firm power and associated energy to the "Eastern Member Cooperatives", including the sale and delivery of such power and energy under contracts by and between SWPA and the "Eastern Member Cooperatives" the effective terms of which expired on June 30, 1977; and

(iii) request that SWPA and instruct and cause the "Oklahoma Companies" to terminate and discontinue as of midnight, November 30, 1977, the present and future delivery, for the account of SWPA, of electric service to the "Eastern Member Cooperatives" under that certain contract No. Ispa-356 dated July 13, 1950, by and between SWPA and the "Oklahoma Companies" the effective term of which expired on June 30, 1977.

If Western, for any reason, fails or refuses to submit contracts or agreements which fulfill the terms and conditions set forth in subpart (1), above, or if Western and the "Eastern Member Cooperatives", for any reason fail or refuse to submit notices and resolution which fulfill the requirements of subpart (2), above, this Contract ipso facto shall be and hereby is rescinded, cancelled, and terminated as of December 1, 1977, and thereafter shall be null and void and without further force or effect.

Doc. #72-30, pp. 7, 40-42 (emphasis added).[7]  PEC was not a party to that agreement.  PEC, along with WFEC and the other Eastern Cooperatives, executed a letter dated November 11, 1977, requesting that SWPA discontinue direct power delivery  to the cooperatives on December 1, 1977.  Doc. #72-29, p. 3.  PEC's contract with SWPA expired in 1977.

SWPA began a comprehensive review of its hydropower allocations in the late

---

[7]*SWPA's commitment to WFEC in the Power Sales Contract was a "peaking" power commitment, rather than an "all requirements" commitment. SWPA agreed to make a certain capacity of power available for purchase by their customers, but limited the number of hours the specified capacity was available.*

1970's. On March 24, 1980, it published a notice in the Federal Register announcing Preliminary Power Allocations it had made to preference customers for 1980-1988 and the allocation criteria used. The notice identified opportunities for public review and comments and stated that, following review of the oral and written comments and other information, SWPA would announce its Final Power Allocations. *See* 44 Fed. Reg. 45468 (Aug. 2, 1979). In the notice, WFEC's power allocation was the same as that it had received under the 1977 Power Sales Contract. Copies of the Preliminary Power Allocations were "mailed to all SWPA customers, prospective customers, and others who [had] expressed an interest in the subject." *Id.* PEC did not object to the notice and the Final Power Allocations were published in the Federal Register on March 24, 1980, as well as the allocation criteria which had been adopted. *See* 45 Fed. Reg. at 19032 (March 24, 1980). The listed criteria included: "1. *Continue sales to present customers.* SWPA will not withdraw any capacity now under contract to a preference customer in order to sell the capacity to another preference customer." *Id.* at 19035. PEC did not offer any comments to the proposed or final allocations SWPA made as part of the process. [8]

WFEC and SWPA began negotiations in 1995 for a new agreement, as the 1977 Power Sales Contract was to expire on May 31, 1997. During a meeting of the WFEC Board of Directors in 1995, at which a SWPA representative was present, Randy Etheridge, PEC's CEO asked "whether the language regarding the allocation rights of the Eastern Cooperatives

---

[8]*PEC does not dispute that it had at least constructive notice of the preliminary and final power allocations.*

was in the draft agreement." Doc. #72-1, p. 5. SWPA and WFEC told him that that language was not in the current draft. PEC's Board responded by concluding that "it was necessary to adopt a formal resolution requiring the contract to contain such language," because "People's Electric Cooperative authorized Western Farmers Electric Cooperative to represent People's Electric Cooperative on its behalf in negotiations with the Southwestern Power Administration." Doc. #72, p. 21; #72-34, pp. 3,4.

The resolution PEC's Board adopted at its May 26, 1995, meeting provided in part:

WHEREAS, People's Electric Cooperative, Inc. is a member of Western Farmers Electric Cooperative, and, as such member, purchases its wholesale electric power from Western Farmers Electric Cooperative and has previously authorized Western Farmers Electric Cooperative to represent People's Electric Cooperative, Inc. in negotiations with the Southwestern Power Administration for the extension of the previous contract which expired July 1, 1977, and for the current contract which expires midnight, May 31, 1997; and

WHEREAS, People's Electric Cooperative, Inc. has been notified that Western Farmers Electric Cooperative and the Southwestern Power Administration have entered into negotiations for a new hydro-electric power contract to succeed the existing power contract, which draft of such contract does not provide specifically for the hydro allocation rights of the Eastern member cooperatives; and

WHEREAS, People's Electric Cooperative, Inc. authorized Western Farmers Electric Cooperative to represent People's Electric Cooperative, Inc. in negotiations with the Southwestern Power Administration specifically on its behalf for the current contract,

NOW, THEREFORE, BE IT RESOLVED that People's Electric Cooperative, Inc. hereby requests that Western Farmers Electric Cooperative and the Southwestern Power Administration include in the new hydro-electric power contract being negotiated specific reference for the allocation rights of the Eastern Oklahoma Cooperatives, and the language in the present contract which will expire midnight, May 31, 1997, be included in the new contract,

namely:

> "It is also recognized that in allocating the quantity of hydro peaking power and associated energy to be purchased by Western Farmers Electric Cooperative (WFEC) under Article 2 thereof, Southwestern Power Administration (SWPA) included quantities of power and energy which SWPA had allocated and would otherwise make available for purchase by the Eastern Member Cooperatives."

> BE IT FURTHER RESOLVED that Western Farmers Electric Cooperative and the Southwestern Power Administration specifically name People's Electric Cooperative, Inc. and the six other Eastern member cooperatives in the new contract as they are identified in the present contract; and

> BE IT FURTHER RESOLVED that with the inclusion of the foregoing contract language and the identification of the Eastern member cooperatives, Western Farmers Electric Cooperative is authorized to negotiate a new contract on behalf of People's Electric Cooperative, Inc. to succeed the contract expiring midnight, May 31, 1997.

Doc. #72-34, p. 4. The other Eastern Cooperatives passed substantially identical resolutions.

While Randy Etheridge testified that he thought that PEC sent the resolution to WFEC and SWPA,[9] Gary Roulet, who participated in the negotiations with SWPA, testified that he was not aware of the resolutions and did not find out about them until "many years later." Doc. #77-2, p. 8.

SWPA and WFEC did not end up executing a new contract. Instead the parties signed an extension or Amendatory Agreement on August 21, 1995, which extended the term of their existing contract through May 31, 2012. The Amendatory Agreement included the language from the original contract on which PEC bases its claims.

_____

[9]*The evidence PEC cites to demonstrate that WFEC was aware of the resolutions, Doc. #72-31, p 15 (depo. p. 29), does not mention the resolutions.*

12

In 2008, PEC contacted SWPA about its ability to reclaim its former 35 MW allocation of hydropower if it exited from WFEC. SWPA's customer representative responded by email. He attached several pages from the WFEC-SWPA contract, Doc. #72-30, pp. 7-8, 41 and stated:

> The body of the WFEC contract does not specifically describe how one of the COOPs can retrieve its Federal power allocation; however, based on my discussion with [Assistant Administrator James McDonald] the history, intent, and wording of the intro supports that SWPA "would otherwise make available" the hydro power of each customer except for the fact that they are under WFEC's umbrella at this time. All the entities are still preference customers and can opt to receive their allocations directly.

Doc. # 72-43.[10]

Two years later, in 2010, SWPA's Assistant Administrator at the time, Jim McDonald, took a different position during a telephone conference call with PEC. PEC's General Manager, Randy Etheridge, and Senior Vice President, John Hudson, participated in the call with Marshall Boyken, McDonald and others from SWPA. When asked what was needed for PEC to get back its historic federal power allocation, which it had given to WFEC in 1973, McDonald noted that the 1980 Federal Power Allocation did not mention prior federal power allocations to any entity and said WFEC must assign the allocation back to PEC. Doc. #72-44.

PEC and WFEC negotiated a settlement agreement, in conjunction with certain antitrust litigation, which resulted in the termination of PEC's membership in WFEC on

---

[10]*WFEC objects to the email on the ground of hearsay. As the court does not find the email to be determinative, it is unnecessary to determine whether it should be excluded.*

March 6, 2013. In May 2012, while the settlement discussions were taking place, plaintiff's counsel sent a letter to SWPA requesting a meeting with SWPA "to discuss PEC's desire to receive directly its allocation of 35 megawatts of hydroelectric power from the Southwestern Power Administration ('SWPA') which is currently being delivered on its behalf to Western Farmers Electric Cooperative ('WFEC')." Doc. #73-7, p.1. SWPA wrote back in June 2012 that it had "conducted a lengthy Administrative Procedures Act public process before publishing its Final Power Allocation of 1980," and, at the conclusion of the process, which included notices in the Federal Register and requests for comments and public forums, WFEC "received an allocation of 260 megawatts of Federal power and associated energy" from SWPA. Doc. #73-8, p. 1. SWPA stated that the historical documentation for the process did not "reveal any comments from PEC or any other entity regarding the WFEC allocation" and that it viewed "all other material outside of this process [which would include the language of the 1977 contract between WFEC and SWPA][11] as immaterial to the allocation of Federal power at this time." *Id.* SWPA stated that "[a]bsent the dissolution of WFEC, there is only one other alternative providing for the delivery of Federal power directly to PEC that Southwestern would recognize – namely circumstances in which PEC and WFEC reach a mutual agreement whereby WFEC would assign a portion of its 260 megawatt allocation directly to PEC." *Id.* at p. 2. In its answer filed in this lawsuit, WFEC indicated it would not to consent to a transfer of a portion of its hydropower from SWPA to

---

[11]*See Doc. #73, WFEC's Undisputed Material Fact #10, which PEC did not dispute.*

PEC.

In 2011, WFEC and SWPA began negotiating a new power sales contract to replace the 1995 Amendatory Agreement, which was to expire on May 31, 2012. By early 2012, WFEC was aware that PEC was seeking the return of what it viewed as its hydropower allocation. Brian Hobbs testified that he let SWPA know that he "thought it made sense in the agreement to clarify what the rights of the – the Eastern co-ops [were]." Doc. #72-47, p. 7. In a March 8, 2012, draft of the agreement, WFEC proposed the addition of the following language after the statement that "The Parties acknowledge and agree that the Eastern Member Cooperatives have transferred any and all rights which may have accrued under this Section 3 to WFEC,"

> and any such rights of WFEC terminated with its contract termination pursuant to Section 4 of this Article IX. WFEC's existing rights and allocation are subject to this Contract and new allocation as set forth herein and pursuant to Southwestern's Final Power Allocation (1980-1988) 45 FR 19032 (1980). WFEC's rights herein, including, but not limited to, WFEC's right to a Federal power allocation, shall not be assigned or modified by WFEC. . . . The following Eastern Member Cooperative Contracts, heretofore entered into by Southwestern and each of the Eastern Member Cooperatives as noted below, terminated as of midnight, November 30, 1979, and thereafter shall be null and void and without further force or effect. [list of each Eastern Oklahoma cooperative omitted]

Doc. #72-48, p.21.[12] On the March 13, 2012, draft SWPA commented that, in lieu of WFEC's proposed changes to the agreement, it "would prefer going back to the current

---

[12]*Although WFEC asserts there is no evidence demonstrating which party proposed the additional language, a subsequent draft indicates that WFEC proposed the changes to Art. IX. Doc. #72-50, p. 1.*

contract language regarding the Eastern Member Cooperatives." Doc. #72-50, p. 27.[13]

The final, executed version of the 2012 contract eliminated all references to the Eastern Cooperatives. It did not include the language WFEC had proposed in the March 8, 2012, draft of the agreement. While the new contract recognized that the prior agreement was "rescinded, revoked, canceled, expired, and terminated" and would "be without further force or effect," it provided that "the rights and obligations of the Parties hereto which accrued prior to the date of such termination, if any, shall be and hereby are preserved." Doc. #72-52, p. 27. On August 10, 2012, the WFEC Board approved the 2012 contract with one dissenting vote, from the trustee selected by PEC.

The new agreement, which became effective on October 1, 2012, and which extends until May 31, 2028, does not refer to any allocation rights of PEC or the other Eastern Cooperatives, but rather states that the prior contract is rescinded and revoked. It obligates SWPA to make the same capacity of peaking hydropower (260 megawatts) available for WFEC to purchase as WFEC received under the prior contract.

PEC and WFEC have entered into an agreement that allows PEC to purchase some amount of wholesale power from WFEC at the member or cost-based rate through 2021. The agreement provides that as long as PEC continues to purchase any amount of power from WFEC at this rate, any federal hydropower made available to PEC by SWPA will continue to be for the benefit of WFEC and not PEC.

---

[13]*WFEC objects to consideration of the comment as hearsay.*

At the outset, it is important to identify the exact nature of the claims PEC is asserting here. Its claims in this case are not against SWPA. It does not argue that, since PEC is no longer a member of WFEC, SWPA is obligated to return PEC's historical power allocation to it. Rather, it relies on SWPA's stated willingness to return that allocation to PEC if WFEC consents to the transfer. As WFEC has refused to consent, PEC seeks here to compel WFEC to give that consent.

PEC's effort to compel consent is not based on any agreement between PEC and WFEC. As noted above, the Wholesale Power Agreement, which substantially governed the relationship between PEC and WFEC over the past 39 years, is silent on the question of what happens to the power allocation if, as has occurred here, PEC and WFEC get "divorced," i.e. PEC ceases to be a member of WFEC. Rather, PEC asserts that, by refusing to give its consent to the transfer, WFEC has breached obligations it owes to PEC, as a third party beneficiary of the Power Sales Contract(s) between PEC and SWPA.

PEC's arguments are inventive and skillfully pressed. However, its reliance on implied duties arising out of implied terms of an agreement to which it was not a party ultimately goes beyond what the circumstances and applicable law will support.

In interpreting the Power Sales Contract, the court applies federal common law, Sec'y of State for Def. v. Trimble Navigation Ltd., 484 F.3d 700, 705-06 (4th Cir.2007) and looks to general contract principles. Interface Kanner, LLC v. J P Morgan Chase Bank, 704 F.3d 927, 932 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 175 (U.S. 2013). If the terms of the

contract are not ambiguous, the parties' intent is determined from the language of the agreement itself.  <u>Wolfgang v. Mid-America Motorsports, Inc.</u>, 111 F.3d 1515, 1524 (10th Cir. 1997).  "A contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense the contract may be understood to reach two or more possible meanings." *Id.* (internal quotations omitted).

The parties focus on whether PEC is a third party beneficiary of the Power Sales Contract.  Because PEC was not a party to the Power Sales Contract, it can enforce it only if it was an intended, rather than an incidental, beneficiary of the contract.[14]  However, the court concludes it unnecessary to belabor the third party beneficiary issue, as the Power Sales Contract does not include a promise such as PEC seeks to enforce.

PEC claims the express language of the Power Sales Contract reflects an intention to benefit it.  The court agrees that the contract was drafted, at least in part, to insure that WFEC was capable of providing PEC and the other Eastern Cooperatives with the hydropower they required.  Arguably, it evidenced SWPA's intent to allow those cooperatives to reclaim their hydropower allocations if the contract terminated on December 1, 1977.  However, even if

---

[14]*The Restatement of contracts explains the distinction between intended and incidental beneficiaries:*

> *(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.*

> *(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.*

*Restatement (Second) of Contracts § 302 (1979).*

PEC was an intended beneficiary of the contract, the Power Sales Contract does not "explicitly state," as PEC claims, nor does it otherwise imply, that PEC would have the right to take its former SWPA power allocation with it if, at some later time, it ceased to be a member of WFEC. The provisions PEC relies on – a recital clause and language in Article XI, Section 3 of the agreement – do not reflect an intention on the part of WFEC and SWPA to protect PEC's right to reclaim its prior hydropower allocation at some future date. Those provisions recognize that SWPA previously sold firm power to seven cooperatives, which were now members of WFEC, and that the agency was agreeing to sell WFEC peaking power that it otherwise would make available to those cooperatives. The contract was conditioned on WFEC demonstrating that it could actually deliver the power to the cooperatives in sufficient quantifies to meet their present and future needs, by submitting certain contracts and agreements.[15] Doc. #72-30, p. 42 (Power Sales Contract, Article XI, Section 3(b)(1)). This condition had to be satisfied within approximately two weeks of the November 14, 1977, execution of the contract or it would be "rescinded, cancelled, and terminated as of December 1, 1977, and thereafter [would] be null and void and without

---

[15]See Doc. #72-30, p. 42 ("Western had to 'submit[] to SWPA a copy of duly executed contracts or agreements which, on the date of submission to SWPA are fully operative, have been approved or accepted for filing by the Federal Energy Regulatory Commission, and which demonstrate and evidence to the satisfaction of SWPA that Western can and will cause power and energy to be delivered to the 'Eastern Member Cooperatives' in quantifies sufficient to fulfill their present and future electric service requirements."); see Doc. #77-2, p. 2 (WFEC "had to take all of the transmission service agreements that SWPA had in place and replace those with service agreements that were in Western Farmers' names, specifically with OG & E and PSO."). As explained by WFEC, "[t]he 1977 contract required WFEC to furnish proof that it had FERC approved contracts demonstrating an ability to deliver power to the Sooner Group cooperatives." Doc. #77, p. 14.

further force or effect." *Id.* The contract was also conditioned on the passage of resolutions

by the Eastern Cooperatives which essentially confirmed that the necessary arrangements for

receiving power through WFEC were in place and allowed SWPA to discontinue "any and

all sale and delivery of firm power and associated energy to the 'Eastern Member

Cooperatives." Doc. #72-30, p. 42. It is undisputed that those conditions were satisfied. The

contract was not, though, conditioned on WFEC agreeing to give up or return to any of the

Eastern Cooperatives their prior power allotment if a Power Sales Contract terminated at

some later time. In other words, even assuming PEC is a third party beneficiary of the Power

Sales Contract for some purposes, the unambiguous terms of the agreement do not confer on

PEC the right to reclaim its prior allotment of hydropower if, after December 1, 1977, it

withdrew from WFEC nor does it reflect, either explicitly or by implication, an agreement

by WFEC to effectuate or assist in any such return. There is therefore no promise for PEC

to now enforce or that would serve as a basis for compelling WFEC's consent.

If, as PEC urges, the circumstances surrounding the transaction are considered, the

court's conclusion would not change.[16] It is undisputed that, in the negotiations leading up

to adoption of the Power Sales Agreement, the parties considered language such as might

support the argument which PEC now makes here. In particular, it appears that SWPA

included, in an early draft, language contemplating allocations to individual member

---

[16]*While the court has considered the circumstances surrounding the contract's execution, it is an unnecessary exercise, as it has found the terms of the Power Sales Agreement to be plain and unambiguous. See generally <u>Wolfgang.</u>, 111 F.3d at 1524.*

cooperatives like PEC. However, at WFEC's request, that language was removed. All that remained was language essentially describing background information as to the power allocation being made to WFEC, rather than a basis for claimed individual allocations by the individual member cooperatives.

As evidence to support its right to reclaim its prior allocation of hydropower, PEC relies on resolutions the cooperatives passed allowing WFEC to negotiate for them. However, neither the resolutions nor any of the other communications cited by PEC[17] that occurred in conjunction with the drafting and execution of the Power Sales Contract demonstrate that the parties to the contract – WFEC and SWPA – reflect an intention to confer on PEC the right to recoup its prior power allocation at a later date.[18] The contract appears to have resulted from the circumstance that, due to increasing demand, SWPA was unable to meet all the energy requirements of the cooperatives as it had in the past. It informed the cooperatives that they needed to find alternative long term power sources, which they did by becoming members of WFEC. The cooperatives agreed to purchase all their power from WFEC and SWPA was willing to let WFEC purchase the power it otherwise would have provided to the cooperatives, if it demonstrated that it could be their

---

[17]These include the April 20, 1976, opinion letter, Doc. #72-20, July 8, 1977 letter from WFEC to SWPA, Doc. #72-26.

[18]Another event that preceded the execution of the Power Sales Contract relied on by PEC, also does not demonstrate the intent needed for PEC to prevail. Contrary to plaintiff's assertion, the letter written by WFEC's general manager to SWPA, dated March 7, 1974, Doc. #72-8, does not "indicate[] that the requested hydropower would go to the Eastern Oklahoma cooperatives as a continuation of their prior allocations." Doc. #72, p. 12.

new long term power source. WFEC did so. PEC and the other cooperatives could have included a provision in the WPA's they executed with WFEC if their intent was to protect their SWPA allocations in the fashion that they urge here, but they did not do so.

Other evidence relied on by PEC does not lead to a different conclusion. It points to the 1995 resolution adopted by the PEC board of directors seeking to assure the continued inclusion, in what became the 1995 Amendatory Agreement, of the language it viewed as the basis for the "allocation rights" of the Eastern Cooperatives. But the view of the PEC board in 1995 says nothing about the intention of the actual contracting parties in 1977. The question is the intent of the parties at the time the agreements were executed in 1977—not sometime later. *See* Greenberg v. Serv. Bus. Forms Indus., Inc., 882 F.2d 1538, 1540 (10th Cir. 1989) ("contracts are to be interpreted according to the intent of the parties at the time the instrument was executed"). And there is no suggestion—if the focus is interpreting the 1995 version—that the contracting parties sought to change the meaning of the included language from whatever had been agreed to in 1977. Similarly, a 2008 interpretation of the contract by an SWPA employee does not prove the intention of the contracting parties in 1977 or 1995 any more than the opinions of any other after-the-fact person who may have addressed the question.[19]

The absence of a contractual right to enforce prevents PEC from prevailing on its

_____

[19]*SWPA has since expressed a different view as to the effect of the contract and of other developments.*

22

breach of contract claim or its claim for breach of the duty of good faith and fair dealing.[20]

Accordingly, PEC's motion for summary judgment [Doc. #72] is denied and WFEC's motion for summary judgment [Doc. #73] is **GRANTED**. Judgment will be enter in favor of WFEC.

**IT IS SO ORDERED**.

Dated this 23rd day of September, 2014.

JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[20]*WFEC makes other arguments, including ripeness and failure to join an indispensable party, which the court rejected in prior orders.*